# Exhibit 3:

# Appellees'/Plaintiffs' Brief

**Case No. 12-13785-DD**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

K.G., by and through his next friend, ILIANA GARRIDO;
I.D., by and through his next friend, NILDA RIVERA; and
C.C., by and through his next friend, RACHELLE CRAWFORD,

Plaintiffs-Appellees,

vs.

ELIZABETH DUDEK, in her official capacity as Secretary, FLORIDA AGENCY
FOR HEALTH CARE ADMINISTRATION,

Defendant-Appellant.

On Appeal from the United States District Court
Southern District of Florida

**APPELLEES' BRIEF**

Miriam Harmatz
Betsy E. Havens
Florida Legal Services, Inc.
3000 Biscayne Boulevard, Suite 102
Miami, Florida 33137
Tel.: 305/573-0092
Fax: 305/576-9664

Jane Perkins
National Health Law Program
101 East Weaver St., Suite G-7
Carrboro, North Carolina
Tel.: 919/968-6308
Fax: 919/698-8855

Monica Vigues-Pitan
Legal Services of Greater Miami, Inc.
3000 Biscayne Boulevard, Suite 500
Miami, Florida 33137
Tel.: 305/438-3817
Fax: 305/232-3616

*COUNSEL FOR APPELLEES*

Garrido v. Dudek
Case No. 12-13785-DD

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellees certify that the Certificate of Interested Persons in the first brief filed, "Appellant's Initial Brief," is complete.

## CORPORATE DISCLOSURE STATEMENT

Florida Legal Services, Inc., the National Health Law Program and Legal Services of Greater Miami, Inc. do not have any parent companies, subsidiaries or affiliates.

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully requests oral argument in order to answer any questions the Court may have.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

TABLE OF CONTENTS.............................................................................. ii

TABLE OF AUTHORITIES ........................................................................iv

STATEMENT OF ISSUES ............................................................................1

STATEMENT OF THE CASE...........................................................................2

    A. Nature of the Case and Course of Proceedings Below.......................2

    B. Statement of Facts.........................................................................9

    C. Standard of Review.........................................................................12

SUMMARY OF ARGUMENT ......................................................................13

ARGUMENT ................................................................................................16

  I.   THE INJUNCTION NEITHER ELIMINATES THE REQUIREMENT THAT A PRESCRIBED SERVICE MUST BE MEDICALLY NECESSARY FOR THE INDIVIDUAL CHILD NOR THE STATE'S ROLE IN MAKING THAT MEDICAL NECESSITY DETERMINATION ......................................................................16

  II.  THE DISTRICT COURT ENTERED AN APPROPRIATE INJUNCTION AND THE SECRETARY'S NEW "OVERBROAD" ARGUMENT SHOULD BE REJECTED AS UNTIMELY ...................................................................................................22

  III. ENJOINING AN ILLEGAL RULE IS WITHIN THE DISTRICT COURT'S SOUND DISCRETION, AND REVERSIBLE ERROR DID NOT OCCUR BECAUSE THE RELIEF INCIDENTALLY EXTENDS BEYOND THE THREE PLAINTIFFS ............................27

  IV. THE COURT DID NOT ABUSE ITS DISCRETION AS THE SCOPE OF THIS INJUNCTION IS NO BROADER THAN NECESSARY FOR THE PLAINTIFFS' COMPLETE RELIEF ...........................................................................................33

V.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ENTERING THE
     DECLARATORY JUDGMENT ...............................................................39

     A. The Trial Court's Adoption Of The Plaintiffs' Proposed Order Was
        Not An Abuse Of Discretion.................................................................39

     B. The Trial Court Did Not Abuse Its Discretion In Declaring The Rights
        And Relations Of The Parties Under The Medicaid Act's EPSDT And
        Comparability Requirements.................................................................42

CONCLUSION.......................................................................................45

CERTIFICATE OF COMPLIANCE.......................................................46

CERTIFICATE OF SERVICE ...............................................................47

ADDENDUM .........................................................................................56

# TABLE OF AUTHORITIES

## Cases

*Access Now, Inc. v. Sw. Airlines Co.,*
   385 F.3d 1324 (11th Cir. 2004) ....................................................25

*Alabama v. U.S. Army Corps of Eng'rs,*
   424 F.3d 1117 (11th Cir. 2005) ....................................................33

*Anderson v. City of Bessemer City, N.C.,*
   470 U.S. 564, 105 S. Ct. 1504 (1985) ..................................... 40, 41

*Bailey v. Patterson,*
   323 F.2d 201 (5th Cir. 1963) .............................................. 27, 28

*Beal v. Doe,*
   432 U.S. 438, 97 S. Ct. 2366 (1977) ............................................16

*Bresgal v. Brock,*
   843 F.2d 1163 (9th Cir.1987) .............................................. 35, 36

*Brown v. Tr. of Boston Univ.,*
   891 F.2d 337 (1st Cir. 1989)......................................... 33, 34, 35

*Bryant v. Jones,*
   575 F.3d 1281 (11th Cir. 2009) ....................................................25

*Burrell v. Bd. of Tr. of Ga. Military Coll.,*
   125 F.3d 1390 (11th Cir. 1997) ....................................................18

*C.F. v. Dep't Children & Families,*
   934 So. 2d 1 (Fl. Dist. Ct. App. 2005)............................................21

*Carmichael v. Birmingham Saw Works,*
   738 F.2d 1126 (11th Cir. 1984) .............................................. 28, 29

*Chudasama v. Mazda Motor Corp.,*
   123 F.3d 1353 (11th Cir. 1997) ....................................................40

*Colony Square Co. v. Prudential Ins. Co.,*
   819 F.2d 272 (11th Cir. 1987)............................................. 40, 41

*Doe v. Gallinot*,
    657 F. 2d 1017 (9th Cir. 1981) ................................................................ 29, 30

*Doe v. Rumsfeld*,
    341 F. Supp. 2d 1 (D.D.C. 2004) ....................................................................31

*Dybczak v. Tuskegee Inst.*,
    737 F.2d 1524 (11th Cir. 1984) ................................................. 28, 29, 33, 34

*E.B. v. Agency for Health Care Admin.*,
    94 So. 3d 708 (Fla. 4 Dist. Ct. App. 2012) ....................................................21

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
    92 F.3d 1486 (9th Cir. 1996) ..........................................................................32

*Fox v. Acadia State Bank*,
    937 F.2d 1566 (11th Cir. 1991) ......................................................................17

*Georgetown Manor, Inc. v. Ethan Allen, Inc.*,
    991 F.2d 1533 (11th Cir.1993) .......................................................................26

*Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*,
    420 F.3d 1317 (11th Cir. 2005) ........................................................... 12, 39, 43

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ........................................................................32

*Hercules Carriers, Inc. v. Fla. Dep't of Transp.*,
    768 F2d 1558 (11th Cir. 1985) .......................................................................44

*Hormel v. Helvering*,
    312 U.S. 552, 61 S.Ct 719 (1941) ..................................................................25

*In re Carbon Dioxide Indus. Antitrust Litig.*,
    229 F.3d 1321 (11th Cir. 2000) ......................................................................26

*King v. Cessna Aircraft Co.*,
    562 F.3d 1374 (11th Cir. 2009) ......................................................................22

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871, 110 S. Ct. 3177 (1990) ............................................................30

*Mackey v. Stanton*,
    586 F.2d 1126 (7th Cir. 1978) ........................................................18

*Madriago v. United States*,
    679 F.3d 1286 (11th Cir. 2012) ......................................................26

*Madsen v. Women's Health Center*,
    512 U.S. 753, 114 S. Ct. 2516 (1994) ............................................33

*Meyer v. Brown*,
    661 F.2d 369 (5th Cir. 1981) ................................................... 28, 29

*Moore ex rel. v. Reese*,
    637 F.3d 1220 (11th Cir. 2011) ........................................... *passim*

*Murray v. Auslander*,
    244 F.3d 807 (11th Cir. 2001) ........................................................16

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998)......................................................30

*Nelson v. Adams USA*, Inc.,
    529 U.S. 460, 120 S. Ct. 1579, (2000) ..................................... 24, 25

*Prof'l Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.*,
    730 F.2d 258 (5th Cir. 1984) ..........................................................33

*Rush v. Parham*,
    625 F.2d 1150 (5th Cir. 1980) ............................................. 5, 16, 17

*S.D. ex rel. Dickson v. Hood*,
    391 F.3d 581 (5th Cir. 2004) ................................................... 20, 31

*Singleton v. Wulff*,
    428 U.S. 106, 96 S. Ct. 2868 (1976) ..............................................35

*Slater v. Energy Serv. Group Int'l Inc.*,
    634 F.3d 1326 (11th Cir. 2011) ......................................................26

*Soto-Lopez v. New York City Civ. Serv. Comm'n*,
    840 F.2d 162 (2d Cir. 1988) ..........................................................29

*Steffel v. Thompson,*
   415 U.S. 452, 94 S. Ct. 1209 (1974) ........................................ 39

*Traynor v. City of Atlanta,*
   805 F.2d 1420 (11th Cir. 1986) ............................................... 18

*U.S. v. Mendoza,*
   464 U.S. 154, 104 S. Ct. 568 (1984) ....................................... 43

*United Farmworkers v. City of Delray Beach, Fla.,*
   493 F.2d 799 (5th Cir. 1974) ................................................... 28

*United States v. Kahn,*
   244 Fed. Appx. 270 (11th Cir. 2007) ...................................... 12

*Wilton v. Seven Falls Co.,*
   515 U.S. 277, 115 S. Ct. 2137 (1995) ..................................... 39

*Wood v. Milyard,*
   ___U.S.___,132 S. Ct. 1826 (2012) ......................................... 24

*Zamecnik v. Indian Prairie Sch. Dist. No. 204,*
   636 F.3d 874 (7th Cir. 2011) ................................................... 29

*Zepeda v. U.S. Immigration & Naturalization Serv.,*
   753 F.2d 719 (9th Cir. 1983) .............................................. 33, 35

**Statutes**

28 U.S.C. § 2106 ......................................................................... 22

28 U.S.C. § 2201 ......................................................................... 42

28 U.S.C. § 2202 ......................................................................... 44

42 U.S.C. § 1396 ........................................................................... 9

42 U.S.C. § 1396a .................................................................... 9, 10

42 U.S.C. § 1396d ................................................................... 9, 43

FLA. STAT. § 409.902 .................................................................................10

FLA. STAT. § 409.919.................................................................................10

FLA. STAT. § 627.6686 ..........................................................................2, 21

**Rules**

11th Cir. R. 28-1 .......................................................................................12

42 C.F.R. § 440.230 ...................................................................... 16, 19, 44

42 C.F.R. §440.200 *et seq.* ........................................................................10

F.R.A.P. 28(a) ...........................................................................................12

F.R.A.P. 28(f).............................................................................................10

F.R.A.P. 32(a) ...........................................................................................46

Fed. R. Civ. P. 23 ................................................................................ 28, 32

FLA. ADMIN. CODE r. 59G *et seq.*........................................................ 10, 11

FLA. ADMIN. CODE r. 59G-4.050 incorporating by reference THE FLORIDA

   MEDICAID COMMUNITY BEHAVIORAL HEALTH SERVICES COVERAGE AND

   LIMITATIONS HANDBOOK................................................................ *passim*

FLA. ADMIN. CODE r. 59G-4.070 ..............................................................20

**Other Authorities**

American Jurisprudence Courts §131 .......................................................18

# STATEMENT OF ISSUES

I.    Did the trial court abuse its discretion when it issued an Injunction which did not enjoin AHCA from making individualized medical necessity determinations for Applied Behavior Analysis (ABA) coverage but did enjoin AHCA to provide ABA as a covered benefit under EPSDT?

II.    Is AHCA foreclosed from arguing that the Injunction is overbroad in benefiting nonparties when this argument was never raised at the trial court and AHCA "invited" the ruling she now objects to as overbroad by presenting argument and evidence throughout the case demonstrating that the Plaintiffs' requested injunctive relief would impact other children?

III.    Did the trial court abuse its discretion by enjoining AHCA's illegal rule, thereby providing relief to nonparties as well as to the Plaintiffs?

IV.    Did the trial court abuse its discretion by ordering injunctive relief which incidentally extends benefit beyond the three Plaintiffs but which was required for the Plaintiffs' complete relief?

V.    Did the trial court commit reversible error by adopting the Plaintiffs' proposed order granting declaratory judgment and by declaring the rights and relations of the parties under the Medicaid Act's EPSDT and Comparability requirements?

1

# STATEMENT OF THE CASE

## A.    NATURE OF THE CASE AND COURSE OF PROCEEDINGS BELOW

Three young Plaintiffs, K.G., I.D., and C.C., all suffer from autism and the disabling behavioral problems associated with their condition. They scratch, bite, and hit themselves and others; bang their heads; and have little or no ability to communicate or interact with people. Autism renders their young lives (and that of their families) excruciatingly difficult. Their doctors prescribed a proven and effective behavioral therapy, Applied Behavioral Analysis (ABA), and provided uncontroverted testimony that ABA is medically necessary.

Because the Plaintiffs' families are impoverished, the Children rely on Medicaid as their only form of health care coverage. Although the Florida Legislature mandated coverage of ABA for children in commercial health insurance plans in 2008, *see* FLA. STAT. § 627.6686, children in Florida's Medicaid program remain without this critical treatment. Pursuant to Defendant's rule governing behavioral health services, Medicaid excludes coverage of any behavioral treatment for autism spectrum disorders without exception, including ABA. The Plaintiffs' physicians testified to the tragic and discriminatory consequences for their patients who rely on Medicaid. Essentially, their patients with insurance receive ABA get better, while those on Medicaid do not. *See* D.E. 149 at 19; D.E. 148 at 178.

2

The Plaintiffs brought this civil rights action against Appellant-Defendant, Elizabeth Dudek, Secretary of the Agency for Health Care Administration (also referred to as "the Secretary," "AHCA," or "Defendant"). Plaintiffs alleged that Defendant's behavioral health services rule violates provisions of the federal Medicaid Act requiring: (1) coverage of treatments needed to correct or ameliorate conditions of beneficiaries under age 21 ("EPSDT"), and (2) equitable treatment of beneficiaries ("comparability").

The Defendant argued that (1) ABA is "experimental" and thus, not "medically necessary," and (2) even if ABA is not experimental, it cannot be covered under the Medicaid Act. *See* D.E. 17; D.E. 18; D.E. 66; D.E. 72.

Given K.G.'s urgent need for treatment, a Motion for Preliminary Injunction was filed on his behalf at the outset of the litigation. *See* D.E. 10. His treating physician warned that without immediate treatment, K.G. could lose the ability to communicate altogether and need supervision for the rest of his natural life. *See* D.E. 10-4 at 3, ¶¶15, 16.

Shortly before K.G.'s preliminary injunction hearing, the complaint was amended to add two additional plaintiffs, I.D. and C.C. *See* D.E. 63. The Injunction requested by the three Plaintiffs was tailored as narrowly as possible to ensure their complete relief, specifically:

1)    an order that Defendant amend their Behavioral Health Services Rule ("the Rule") to delete ASD [autism spectrum disorders] as one of the

3

diagnoses excluded from Medicaid coverage for any behavioral treatment services;

2)    an order that the Defendant amend the Rule to include coverage of medically necessary Applied Behavior Analysis for EPSDT eligible children;

3)    an order ensuring that the three Plaintiffs receive coverage of medically necessary ABA.

*See* D.E. 63 at 12(C)(i)-(iii).

On November 1, 2011, the court entered an Order granting K.G.'s motion for a mandatory preliminary injunction.  D.E. 74. At the trial, one month after K.G. began treatment, his mother and therapist testified about ABA's impact: "I am seeing again the baby that I had, happy and smiling, a baby that I lost." *See* D.E. 147 at 117.  The therapist testified that K.G.'s kicking, biting, and hitting, which occurred 60 times during a three hour session at the initial assessment, had decreased to zero.  *See* D.E. at 148 at 17.

From the filing of the case through the lower court's issuance of Permanent Injunction and entry of Final Judgment, both parties litigated the case as if the Plaintiffs' first two requests for injunctive relief would, if granted, benefit nonparties.  The Secretary did not raise a claim that the request for injunctive relief was "overbroad"—not as an affirmative defense, in her briefing on preliminary injunction or summary judgment, during oral argument, or during the four day trial.  She never took the position that any possible relief would be "afforded only

4

to the Plaintiffs." *See* Defendant-Appellant's Brief at 37 (hereafter referred to as "AHCA's Br.").[1]  To the contrary, the Secretary's position throughout the litigation below was that the Medicaid beneficiaries' requested relief would benefit similarly situated children. *See, e.g.,* D.E. 98-1 at 3; D.E.115 at 11 ¶ ¶34-39.

The major factual dispute in the case below involved the Secretary's claim that ABA was "experimental." Under established case law, a Medicaid service is determined to be experimental based upon whether it is considered proven and effective by the medical community. *See Rush v. Parham,* 625 F.2d 1150, 1156 n. 11 (5th Cir. 1980).  If so, then it is not experimental.  If, on the other hand, the service is "relatively unknown" or there is no consensus in the medical community regarding its efficacy, then evidence must be provided to establish its safety and efficacy. *Rush,* 625 at 1156 n. 11.

The Secretary had difficulty identifying an expert to support her position that ABA is experimental. *See* D.E. 80-3 at 2[2] (AHCA Nov. 3, 2011 email to Medicaid agency staff in Georgia asking if he could refer an expert: "We have a federal case (*KG v. Dudek*) . . . Medicaid considers ABA experimental.  We have been unable to find an expert to testify on our behalf.").  Some six months after the deadline for

---

[1] Page references to AHCA's Brief will be to the pagination at the bottom of the page and not to the Court's electronic watermark at the top of the document.

[2] Admitted into evidence as Plaintiffs' Trial Ex. 40. *See* D.E. 147 at 160.

expert discovery and two months after the conclusion of summary judgment briefing, AHCA requested permission to extend expert disclosures. *See* D.E. 56; D.E. 96. After representing that these new experts would support AHCA's position (D.E. 83 at 3), the district court granted Defendant's extension request (D.E. 96). Shortly thereafter, the court denied Plaintiffs' Motion for Summary Judgment, finding that "material issues of fact existed as to whether the Defendant's determination that ABA was experimental—and therefore not medically necessary—was reasonable." D.E. 105 at 16-17. A four-day bench trial ensued.

## OPINION OF THE DISTRICT COURT

The court ruled from the bench in favor of the Plaintiffs. *See* D.E. 150 at 196-201. An Amended Permanent Injunction Order (also referred to as the "Injunction" or "the Order") followed three days later. D.E. 123. The court provided extensive factual findings supporting her decision that "Florida's exclusion of ABA for Medicaid-eligible minors diagnosed with autism or ASD violates the broad mandate in the federal Medicaid Act," (D.E. 123 at 24) and that Defendant was "unreasonable, arbitrary, and capricious" in determining that ABA was experimental. *See* D.E. 123 at 22.

In determining if a requested service is "experimental," AHCA officials testified that while they usually consult with clinicians for a "clinical evaluation of

6

the data" (D.E. 123 at 15), they did not do so for ABA. D.E. 123 at 19; D.E. 148 at 125-126. Instead, when the initial complaint was filed, Defendant's legal counsel and Medicaid officials conducted their own selective literature review on ABA. *See* D.E. 123 at 16-19. After what the court characterized as a "cursory" review of five reports (most of which did not meet the State's own definition of "reliable evidence") and a "complete fail[ure] to follow its own standard procedures," Defendant concluded that ABA was "experimental." *See* D.E. 123 at 18-19.

The reports primarily relied on by the Secretary critiqued ABA's efficacy due to the lack of randomized, large-scale, controlled trials. *See* D.E. 123 at 17 n. 22 – 18 n. 23. The court, however, found this standard unreasonable in evaluating ABA's efficacy because such trials are not appropriate or feasible for the vast majority of ABA research involving children with Autism Spectrum Disorders, and it is unethical to have a control group of children not receiving ABA therapy. *See id.* The court found that "all the experts that testified for Plaintiffs and Defendant stated that they have never seen a study in the peer-reviewed literature where the authors concluded that ABA was ineffective as a treatment for children with autism or a study that characterized ABA as experimental." D.E. 123 at 24. The court further found that the Plaintiffs' experts established that "there exists in the medical and scientific literature a plethora of peer-reviewed meta-analyses, studies, and articles which clearly establish that ABA is an effective and significant

7

treatment to prevent disability and restore developmental skills to children with autism and ASD." *Id.* at 23.

Finally, in considering the public interest factor required for a permanent injunction, the court found that "paying for the cost of ABA for autistic children will ultimately save public funds." D.E. 123 at 25.

Shortly after the Permanent Injunction was entered, the Secretary issued an interim policy providing coverage of ABA for children with autism.[3] In May, the court requested a status report from each party regarding the need for a declaratory judgment. *See* D.E. 134. The parties provided contemporaneous submissions (D.E. 140; D.E. 142), and Plaintiffs' Proposed Declaratory Judgment Order was adopted on June 14, 2012 (D.E. 144). Final judgment was entered that same day. D.E. 145. The Secretary appealed on July 11, 2012 (D.E. 155) and on July 27 filed a Motion for a Partial Stay Pending Appeal (D.E. 158). This stay motion has been fully briefed including a sur-reply; there has not yet been a ruling by the district court. D.E. 158; D.E. 164; D.E. 165; D.E. 169.

---

[3] *See* Interim Policy "Billing Instructions" for Developmentally Disabled Waiver Providers, Community Behavioral Health Providers, and Early Intervention Services Providers, *available at*: http://www.fdhc.state.fl.us/medicaid/childhealthservices/chc-up/index.shtml.

**B.    STATEMENT OF FACTS**

We accept the Secretary's Statement of Facts in all but two respects. It does not include facts regarding the Medicaid program nor does it explain relevant details of AHCA's Behavioral Health Services Rule as follows:

**THE MEDICAID PROGRAM**

Title XIX of the Social Security Act authorizes the Medicaid program, a joint federal-state program which enables low-income individuals to obtain health care. *See* 42 U.S.C. §§ 1396-1396w-5. Participating states must provide Medicaid coverage to low-income children, *id.* at § 1396a(a)(10)(A)(i)(III)-(VI), and cover early and periodic screening, diagnostic, and treatment services ("EPSDT") for Medicaid-eligible children under age 21, *id.* at §§1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r). As part of EPSDT, states must provide recipients under age 21 with "necessary health care, diagnostic services, treatment and other measures described in subsection (a) of this section [listing 29 categories of services] to correct or ameliorate defects and physical and mental conditions discovered by the screening services, whether or not the services are covered under the State plan for adults." 42 U.S.C. § 1396d (r)(5). *See Moore ex rel. v. Reese*, 637 F.3d 1220, 1233, 1255 (11th Cir. 2011).

In addition to setting forth required coverage groups and services, the Medicaid Act requires participating states to ensure that similarly eligible

recipients throughout the states are treated equitably. This "comparability" requirement mandates that services be equally available in amount, duration, and scope for all similarly eligible Medicaid recipients and that states not discriminate based on the recipients' diagnosis. *See* 42 U.S.C. § 1396a(a)(10)(B); 42 C.F.R. §440.200 *et seq.* The Act's "state-wideness" requirement obligates states to operate their Medicaid program uniformly "in all political subdivisions of the State ... and be mandatory upon them." 42 U.S.C. § 1396a (a)(1).

Florida has designated AHCA as the single state agency responsible for implementing the Medicaid program and ensuring that the State's rules and guidelines for covered services are consistent with the federal law. *See id.* at §§ 1396a(a)(5), 1396a(a)(30); FLA. STAT. §§ 409.902, 409.919; FLA. ADMIN. CODE r. 59G *et seq.*

### AHCA's Behavioral Health Services Rule

AHCA's rule describing coverage of behavioral health services is at FLA. ADMIN. CODE r. 59G-4.050, which incorporates by reference THE FLORIDA MEDICAID COMMUNITY BEHAVIORAL HEALTH SERVICES COVERAGE AND LIMITATIONS HANDBOOK[4] (referred to herein as "the Rule"). D.E. 98-1 at 7 ¶ 35. AHCA does not provide covered behavioral services directly to recipients. Rather,

---

[4] The Rule was admitted into evidence as Plaintiffs' Trial Ex. 6. *See* D.E. 149 at 38. Pursuant to F.R.A.P. 28(f), relevant portions of the Rule are also included in the attached Addendum.

as with all services, Medicaid-participating health care providers are reimbursed for services provided to eligible beneficiaries. Pursuant to the Rule's requirements, the only services which are eligible for reimbursement are those listed in the Rule. All of AHCA's rules provide a detailed description of each covered service, including billing codes and procedures as well as prior authorization and utilization review requirements. For example, prior to receiving a prescribed behavioral treatment, an assessment is completed recommending frequency and amount of treatment, which is then submitted for review and authorization. *See* Plaintiffs' Trial Ex. 6 at 1-10; 2-1-1. Finally, there is a requirement in all Medicaid rules, including the rule for behavioral services, that any prescribed treatment must be medically necessary to be covered. *Id.* at 1-2. S*ee generally* FLA. ADMIN. CODE r. 59G *et seq.*

The Rule limits coverage of mental and behavioral health services to treatment of certain psychiatric diagnoses (D.E. 98-1 at 7 ¶ 36-38). Autism Spectrum Disorders (ASD) are specifically excluded from any coverage of behavioral health services. *See* Plaintiff's Trial Ex. 6 at 2-1-4.; D.E. 98-1 at 7 ¶ 38.[5] The Rule also lists and describes the particular mental and behavioral health services that can be covered for Medicaid recipients. *See* Plaintiffs' Trial Ex. 6 at

---

[5] Autism and ASD are diagnoses listed in the American Psychiatric Associations' Diagnostic Statistical Manual IV (DSM IV) and the International Classification of Diseases. D.E. 98-1 at 6 ¶ 30.

2-1-6 through 3-1-34; *see also* Addendum Table of Contents; D.E. 98-1 at 7, ¶36. ABA is not included among the covered benefits.  There are no exceptions in the Rule for recipients under age 21. D.E. 98-1 at 7 ¶ 39 (Pre-Trial Stipulations).  *See also* AHCA's Brief at 6 n. 4 ("the availability of an exception . . . is not at issue in this appeal.").

## C.    STANDARD OF REVIEW

The lower court Orders should be affirmed unless there was an abuse of discretion.    For declaratory relief, this standard requires the Court to "leave undisturbed a district court's ruling unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1325 (11th Cir. 2005).  For injunctive relief, "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *United States v. Kahn,* 244 Fed. App'x 270, 273 (11th Cir. 2007) (citation omitted).  As established below, the Secretary's arguments for reversal fall far short of this demanding standard.[6]

---

[6] The Secretary initially correctly cites the abuse of discretion standard of review in her "Statement of the Issues."  *See* AHCA's Br. at 1.  In her "Standard of Review" however, the Secretary incorrectly states that a *de novo* standard applies.  *See* AHCA's Br. at 7.  Further, in violation of by F.R.A.P. 28(a)(9)(B) and 11th Cir. R. 28-1(i)(iii), she fails to indicate the corresponding issue or question of law that should be reviewed with this standard. *See id.* at 7.

## SUMMARY OF ARGUMENT

The Defendant has not come close to demonstrating that the trial court abused its discretion in granting Plaintiffs' injunctive and declaratory relief. Notably, she does not challenge a single finding of fact or conclusion of law underlying the district court's justification for the Orders. Rather, she argues that the Injunction is "overbroad" in two respects.

First, AHCA contends that the district court improperly enjoined it from making *individual* medical necessity determinations for Medicaid-eligible children. This is not at all what the court ordered. *See* D.E. 123 at 25-26. It is beyond dispute that Medicaid law and controlling precedent require that covered prescribed services be medically necessary for the individual patient and that the state Medicaid agency plays a role in that determination. Indeed, AHCA essentially refutes its own argument by declaring that the district court's ordered relief will not prevent AHCA from reevaluating the medical "necessity of Plaintiffs' ABA treatment at an appropriate time in the future." *See* AHCA's Br. at 12 n. 5.

Second, AHCA contends that the Injunction—which covered ABA as an EPSDT-benefit—should be limited solely to the three Plaintiffs because this is not a class action. As a preliminary matter, the Secretary *never* made this argument below, and it was not preserved for appeal. Further, it is inconsistent with her litigation position at the trial court level where she argued that Plaintiffs' requested

13

injunctive relief would impact nonparties throughout the state at significant cost to Defendant. Indeed, the Secretary "invited" the trial court's ruling through her argument and evidence demonstrating that a victory by Plaintiffs would require AHCA to include ABA as a covered treatment available for other children with autism disorders. The Secretary should be foreclosed from now raising an argument she never presented below and "invited" through her litigation strategy.

Even if the Secretary's newly minted overbroad argument is not foreclosed on appeal, it is contrary to well-established case law. Courts have consistently rejected the claim that nonparties cannot benefit from injunctive relief in the absence of a class—particularly when an illegal rule or practice is challenged. Even the Defendant admits that courts have authority to enjoin an invalid statute or rule and enter injunctive relief benefitting nonparties. *See* AHCA's Br. at 31. The key issue in determining if an injunction is overbroad is whether it is necessary for the Plaintiffs' complete relief. If the ordered relief is necessary, then the injunction is not made overbroad by the fact that it incidentally benefits similarly situated parties not before the court.

In this case, the Plaintiffs' complete relief required an order enjoining the Secretary to provide ABA as a covered benefit. The challenged Rule violates the Medicaid Act both by excluding Medicaid coverage of behavioral health treatment for children with ASD *and* by not including ABA as a covered behavioral health

14

service. The Secretary erroneously argues that the Order should be limited to enjoining AHCA to delete ASD from the diagnoses ineligible for coverage of any behavioral health services and to no longer categorically deny ABA services as experimental. *See* AHCA's Br. at 31-32. This argument ignores how the Medicaid program and the Rule operate, and the Order Defendant suggests falls far short of what the Plaintiffs need for relief. The only way in which the Plaintiffs could get coverage of ABA is with an order enjoining AHCA to provide it as a Medicaid covered behavioral treatment.

The Secretary's overbroad argument regarding the declaratory judgment is similarly erroneous.  Both the Amended Permanent Injunction and Declaratory Judgment are well within the trial court's discretion and should be affirmed.

# ARGUMENT

## I. THE INJUNCTION NEITHER ELIMINATES THE REQUIREMENT THAT A PRESCRIBED SERVICE MUST BE MEDICALLY NECESSARY FOR THE INDIVIDUAL CHILD NOR THE STATE'S ROLE IN MAKING THAT MEDICAL NECESSITY DETERMINATION.

The Secretary erroneously argues that the trial court ordered ABA to be provided to all children with ASD "without individualized medical necessity determinations." *See* AHCA's Br. at 13. The trial court did no such thing. *See* D.E. 123 at 25-26.

It is axiomatic that coverage for a prescribed service can be denied if the service is not "medically necessary" for the individual beneficiary. This is the standard practice in any insurance program, including Medicaid. *See* 42 C.F.R. § 440.230(d) (authorizing the single state agency to "place appropriate limits on a service based on such criteria as medical necessity"). It is undisputed that Medicaid beneficiaries have the initial burden of proving medical necessity. *See* D.E. 98-1 at 12, sec. 7, ¶2; D.E. 123 at 6. It is also undisputed that AHCA has a role in making medical necessity determinations. *See Moore*, 637 F.3d at 1244, 1257; *Rush*, 625 F.2d at 1155; *Beal v. Doe*, 432 U.S. 438, 444-45, 97 S. Ct. 2366, 2371 (1977). Indeed, *Moore* firmly established that both the individual Medicaid recipient's physician and the state had a role in determining if a coverable, prescribed service is medically necessary and therefore "covered" for an individual patient. *See Moore*, 637 F.3d at 1257; *see also Murray v. Auslander*, 244 F.3d 807,

16

809 n. 2 (11th Cir. 2001) ("Federal law allows Medicaid plans to apply a 'medical necessity' test to all applicants.") (citation omitted); *Rush*, 625 F.2d at 1155 (holding that "a state Medicaid agency can review the medical necessity of treatment prescribed by a doctor on a case-by-case basis").

The district court was well aware of these Medicaid requirements and controlling cases, incorporating and discussing them repeatedly. *See, e.g.,* D.E. 98-1 at 12, Sec. 7 ¶ 2 (Parties' Joint Pre-Trial Stipulations) (incorporated in Inj. Order, D.E. 123 at 6) ("For any individual Medicaid recipient, the recipient has the burden of proving that a service is medically necessary."); D.E. 123 at 11 (Inj. Order) (citing *Rush* and *Moore*).   The requirements that prescribed services must be medically necessary for the individual child and that the State has a role in that determination were in no way altered by the Order.  If the lower court had intended to execute a stark departure from this controlling precedent, it would have needed to do so with explicit language, e.g., ordering AHCA to provide ABA *"regardless"* of whether the prescribed ABA is medically necessary or *"excluding"* AHCA from a role in determining individual medical necessity.[7] *See, e.g., Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) ("[A] District

---

[7] Defendant's repeated assertions that AHCA's undisputed role in individual medical necessity determinations has been "disregarded," "forbid[en]," "exclude[d]," "divested," "wrest[ed]," are simply inaccurate and reflect a bald faced attempt to rewrite the order. *See* AHCA's Br. at 13, 18, 20, 21, 32.

Court in this circuit is bound by this court's decisions."); American Jurisprudence Courts §131 ("A court's decision to depart from precedent . . . must be explained carefully and fully to insure that the court is not acting in an arbitrary or capricious manner."). As this Court explained in *Burrell v. Bd. of Tr. of Ga. Military Coll.,* 125 F.3d 1390, 1395 (11th Cir. 1997), an order's lack of certain "magic words" does not constitute reversible error, especially where, as here, the law is abundantly clear:

> While the district court's language in this case might at times have been more clear, a district court, writing after a bench trial, is not required to use "magic words" or to write with such precision that no trained legal mind could find an ambiguity. "Trial judges are presumed to know the law and to apply it in making their decisions." [citations omitted] . . . Only if no reasonable construction of what the district court wrote can support a lawful judgment, will we find error.

*See also Mackey v. Stanton*, 586 F.2d 1126, 1130 (7th Cir. 1978) ("When confronted with a court order subject to two possible interpretations, one in compliance with applicable federal regulations, the other in violation of those regulations, we must presume that the court intended its order to comply with the controlling law."). *Accord Traynor v. City of Atlanta*, 805 F.2d 1420 (11th Cir. 1986) (arguably overbroad order affirmed to conform with the record).

At its core, the Secretary's reading of the Order wrongly conflates the global/macro-level coverage requirement reflected in the lower court's ruling,

namely that AHCA must provide ABA as a coverable Medicaid benefit, with the individual/micro-level requirement of medical necessity.[8]  On an individual level, it is undisputed that a Medicaid prescribed service including the amount, duration, and scope must be medically necessary before coverage is approved.  *See Moore*, 637 F.3d at 1255; 42 C.F.R. §440.230.  Notably, the Order does not direct AHCA to provide K.G., I.D., or C.C. (or any other child) with a specific amount of ABA as this case does not concern micro-level determinations of individual medical necessity.

Rather, the case addresses AHCA's determination at the global/programmatic level that ABA was "experimental and therefore *never* medically necessary." *See* AHCA's Br. at 31-32. *See also* D.E. 17 at 6-15; D.E. 48 at 1-4; D.E. 76 at 3-8; D.E. 123 at 3. Based on a "plethora of peer reviewed meta-analyses, studies and articles that clearly establish that ABA is an effective and significant treatment," the district court correctly concluded that ABA is not experimental and is medically necessary. *See* D.E. 123 at 23. Accordingly, the court enjoined AHCA to cover ABA for children with autism disorders. D.E. 123 at 9-11. The Injunction is typical of those issued in Medicaid cases. For example, in *Smith v. Benson*, 703 F. Supp. 2d 1262, 1279 (S.D. Fla. 2010), the court

---

[8] The Defendant's confusion is reflected in her misstatement that the court "expressly ordered that 'ABA is medically necessary.' " *See* AHCA's Br. at 19 (citation omitted).  The court made no such order. *See* D.E. 123 at 11, 25-26.

19

enjoined AHCA from denying coverage of diapers to EPSDT eligible children and ordered AHCA to notify relevant medical supply providers of this policy change. AHCA subsequently amended the rule governing medical supplies to delete diapers from the list of excluded items and to specify that diapers are a covered benefit for children ages four to twenty-one. *See* FLA. ADMIN. CODE r. 59G-4.070.[9] *See also S.D. ex rel. Dickson v. Hood*, 391 F.3d 581 (5th Cir. 2004).

Similarly, in this case, the Order enjoins AHCA to "provide, fund, and authorize ABA" and to inform relevant providers "that ABA is now a covered service for children who have been diagnosed with Autism Spectrum Disorder." D.E. 123 at 26 ¶ 2-5. The Order contains absolutely no language eliminating the requirement that prescribed ABA be medically necessary for an individual child or restricting AHCA's role in determining if a child's prescribed ABA can be denied, terminated, or reduced because it is not medically necessary for that child. *See* D.E. 123.[10]   The Secretary effectively concedes this when she reserves the right to

---

[9] While children under age four are within the EPSDT eligible population of children under age 21, diapers are not "medically necessary" for infants and toddlers because their incontinence is due to age, and thus, diapers are not necessary to correct or ameliorate a medical or behavioral condition.

[10] The Secretary cites to trial testimony by Plaintiffs' doctors and experts relating to the importance of providing ABA to young children such as the three Plaintiffs and their risk of irreparable injury without imminent treatment. *See* AHCA's Br. at 22-24. In arguing that the trial court abused its discretion by allegedly mandating that ABA be provided to all children "regardless" of their individual need, she states that "for many children above the age of seven—and even more children

20

review the ongoing medical necessity of the Plaintiffs' prescribed ABA.  *See*
AHCA's Br. at 12 n. 5.

Significantly, every service which can potentially be provided to a Medicaid
beneficiary—from penicillin to speech therapy—must first be included as a
"coverable" service in the applicable AHCA rule.  That does not mean, however,
that penicillin must be "covered" for every individual with pneumonia or that the
prescribed amount of speech therapy must be "covered" for every child who
stutters. Rather, individual medical necessity determinations for recipients under
age 21 are made to ensure coverage of the proper mix and amount of services
necessary to "correct or ameliorate" the child's condition.[11]  Therefore, when the

---

approaching twenty-one—ABA services will not be effective." AHCA's Br. at 24.
Again, whether or not ABA is "effective" for these children is an individual
determination.  And if the prescribed ABA is not "effective" in ameliorating any
child's condition —whether for "older" children or "younger" children, including
the three Plaintiffs — the Defendant can deny, reduce, or terminate it. To the
extent AHCA may or may not be performing individual medical necessity
determinations at this time, this is their choice. *See* D.E. 158; D.E. 169; D.E. 171.
Notably, Florida mandates that private insurers offer ABA as a covered benefit
until age 18, or longer in certain circumstances. *See* FLA. STAT. § 627.6686.

[11] States must cover services for all EPSDT-eligible recipients which "are
medically necessary to correct or ameliorate [an] illness and condition." *Moore*,
637 F.3d at 1255.  While not an issue in this case, on multiple occasions, courts
have found that the Secretary fails to apply the "correct or ameliorate" standard of
medical necessity under EPSDT.  *See C.F. v. Dep't Children & Families*, 934 So.
2d 1, 6 (Fl. Dist. Ct. App. 2005) (holding that the Florida improperly applied a
narrower definition of "medical necessity" than that required under EPSDT); *E.B.
v. Agency for Health Care Admin.*, 94 So. 708 (Fla. 4 Dist. Ct. App. 2012)
(same).

Defendant reviews the medical necessity of any child's prescribed ABA (including the Plaintiffs), if the treatment is not "correcting or ameliorating" the condition, it can appropriately be denied, reduced or terminated.

In sum, the Secretary devotes over half of her argument to a ruling the lower court did not make and an issue that is not in dispute. *See* AHCA's Br. at 13-25. Accordingly, the Eleventh Circuit could dismiss this portion of the appeal. Alternatively, in an overabundance of caution, the Court could affirm with an order to modify ¶ 2 of the Order (D.E. 123 at 26) as follows: "[T]he State of Florida is hereby ordered to provide, fund, and authorize '*medically necessary*' Applied Behavioral Analysis treatment . . . " *See, e.g., King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1384 (11th Cir. 2009) (noting 28 U.S.C. § 2106 gives appellate courts the power to modify and affirm a lower court order).

## II. THE DISTRICT COURT ENTERED AN APPROPRIATE INJUNCTION AND THE SECRETARY'S NEW "OVERBROAD" ARGUMENT SHOULD BE REJECTED AS UNTIMELY.

AHCA also contends that the trial court abused its discretion by ordering "overly broad" injunctive relief which benefits nonparties. *See* AHCA's Br. at 25. While the argument is without merit, *see infra.* at Section III and IV, it should be rejected outright because it is a new argument that is completely inconsistent with AHCA's litigation position below.   Indeed, the Secretary "invited" the very injunction she now claims is overbroad.

Prior to entry of the Final Judgment, D.E. 145, the Secretary's position was unequivocal: if the Plaintiffs prevailed, their requested injunctive relief would benefit other children who need ABA to treat their autism disorders. The Secretary never challenged the "breadth" of Plaintiffs' requested injunction in terms of its potential benefits to nonparties.[12] To the contrary, the record contains significant evidence and argument—from the Secretary in particular—demonstrating to the trial court that a victory for the Plaintiffs would require AHCA to include ABA as a covered treatment for other eligible children.

The parties first informed the district court that the case involved "systemic issues affect[ing] numerous indigent children in the state of Florida who suffer from autism" in the Joint Scheduling Report. D.E. 27 at 3(h). The Plaintiffs stated that the declaratory and injunctive relief they sought would remedy the alleged violation and that the legality of the challenged state rule could be addressed without moving for class certification. *Id.* The Secretary did not disagree.

Significantly, AHCA's defense focused heavily on costs to the State should the Plaintiffs prevail. At multiple junctures throughout the case, the Secretary presented argument and evidence related to the cost of providing ABA as a covered benefit.  AHCA's fact witnesses included Karen Chang, a Senior

---

[12] Defendant first raised this argument on July 27, 2012 (D.E. 158) long after entry of the Amended Permanent Injunction (D.E. 123 entered 3/26/12) and Final Judgment (D.E. 145 entered 6/14/12).

23

Management Analyst, who testified that the injunctive relief would impact a number of children potentially eligible for ABA at an estimated cost of $12.2 million. *See* D.E. 147 at 96-103. AHCA later informed the trial court that this estimate was too low. *See* D.E. 98-1 at 2-3 (Amended Joint Pretrial Stipulation "*concise statements of the case*"). On the eve of trial, AHCA filed "*Proposed Findings of Fact and Conclusions of Law*," devoting an entire section to the "Cost of Adding ABA to Medicaid's State Plan." D.E. 115 at 10-11¶ 34-39. *See also* D.E. 149 at 119-23.

Throughout the litigation, the Secretary highlighted the costs of covering ABA for nonparties if the Plaintiffs prevailed. But now, after losing the case on the merits, she argues that the district court abused its discretion by ordering relief which benefits nonparties, stating that the Injunction should be reversed and limited to the three Plaintiffs. *See* AHCA's Br. at 25-32, 37. This argument is a radical reversal from her previous litigation position and violates the basic rule that issues must be raised in the lower court in order to be preserved as potential grounds for appeal.

The principle of preservation is well established. As the Supreme Court recently declared in *Wood v. Milyard*, __ U.S. __, 132 S. Ct. 1826, 1832 (2012), "It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal" (citations omitted). *See also Nelson v. Adams*

24

*USA, Inc.*, 529 U.S. 460, 469, 120 S. Ct. 1579, 1586 (2000) (stating rule of "preservation" requires that lower courts be fairly put on notice as to the substance of the issue or else it will not be considered on appeal); *Hormel v. Helvering*, 312 U.S. 552, 556, 61 S. Ct 719, 721 (1941) (explaining that, in order to "preserve" an argument for appeal, appellant must first clearly raise it at the district court because "litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence").

The Eleventh Circuit has "repeatedly held that 'an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.'" *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (citations omitted). In *Access Now*, plaintiffs, who lost their ADA claim at the district court, were not allowed to abandon the arguments they made to the district court and raise an entirely new theory on appeal.   This Court explained, "We cannot allow [a party] to argue a different case from the case she presented to the district court" and cited to some eighteen other Eleventh Circuit cases reaching the same conclusion. *Access Now*, 385 F.3d at 1331. *See also Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009) ("[A]bsent extraordinary circumstances, legal theories and arguments not raised squarely before the district court cannot be broached for the first time on appeal.").   AHCA never presented any affirmative defenses, legal arguments, or factual evidence supporting her present claim that the

25

requested injunctive relief requested was improperly overbroad. Pursuant to this Circuit's overwhelming precedent, the Secretary's new argument should not be considered on appeal.[13]

Moreover, AHCA did not simply fail to preserve this new argument. In repeatedly addressing the statewide costs of the Plaintiffs' requested injunctive relief, the Secretary "invited" the very ruling she now claims is an appealable error. "[I]t is a 'cardinal rule' of appellate procedure 'that a party may not challenge as error a ruling . . . invited by that party.'" *Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533, 1539-40 (11th Cir. 1993) (citations omitted).  In these circumstances, the Eleventh Circuit has repeatedly held that "When a party invites a ruling by the district court, he affirmatively waives the right to later challenge that ruling on appeal." *See, e.g., Madriago v. United States*, 679 F.3d 1286, 1293 (11th Cir. 2012); *In re Carbon Dioxide Indus. Antitrust Litig.*, 229 F.3d 1321, 1327 (11th Cir. 2000) (holding that appellants were estopped from challenging as error a ruling invited by that party).

---

[13] Although there are limited exceptions to the preservation rule, Defendant never argued that any of them apply. *See Slater v. Energy Serv. Group Int'l Inc.*, 634 F.3d 1326, 1332 (11th Cir. 2011).

## III.  ENJOINING AN ILLEGAL RULE IS WITHIN THE DISTRICT COURT'S SOUND DISCRETION, AND REVERSIBLE ERROR DID NOT OCCUR BECAUSE THE RELIEF INCIDENTALLY EXTENDS BEYOND THE THREE PLAINTIFFS.

After determining that the Secretary had violated EPSDT in excluding ABA as a covered treatment, the court enjoined the Defendant's illegal rule, ordering that ABA be provided for eligible children.  Defendant erroneously contends that the court abused its discretion in granting this relief because it benefited children not before the court.  *See* AHCA's Br. at 25. However, the Secretary herself concedes that "where an injunction is directed against an invalid statute or administrative rule or practice, a court may enjoin enforcement altogether." AHCA's Br. at 31.

The Eleventh Circuit has long held that injunctive relief may benefit nonparties where the plaintiff is entitled to relief from an illegal policy or rule. In *Bailey v. Patterson*, 323 F.2d 201, 206 (5th Cir. 1963), this Court rejected the contention that relief should be limited to the three plaintiffs in the absence of a properly certified class.[14] As in this case, the plaintiffs in *Bailey* challenged an illegal state law and sought permanent injunctive relief.  *See id.*  This Court held that it was "unnecessary" to determine whether the action was properly brought as

---

[14] *See Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981).

a class under Fed. R. Civ. P. 23 because parties and nonparties are entitled to the same relief:

> Whether or not appellants may properly represent all . . . [nonparties] similarly situated, the decree to which they are entitled is the same . . . The very nature of the rights appellants seek to vindicate requires that the decree run to the benefit not only of the named plaintiffs but also for all persons similarly situated.

*Id.*

*United Farmworkers v. City of Delray Beach, Fla.*, 493 F.2d 799 (5th Cir. 1974) reiterated the *Bailey* holding.  In that case, plaintiff farm workers brought suit against the municipality alleging federal civil rights violations.  This Court found it unnecessary to determine if denial of class certification was an abuse of discretion because "the requested injunctive and declaratory relief will benefit not only the individual appellants . . . but all other persons subject to the practice under attack." *Id.* at 812.

While *United Farmworkers* and *Bailey* were initially filed as class actions, this Circuit has also recognized that injunctive relief benefiting nonparties may be proper in individual actions. *See, e.g., Meyer v. Brown*, 661 F.2d 369, 374 (5th Cir. 1981); *see also Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1136 (11th Cir. 1984) ("class wide injunctive relief may be appropriate in an individual action"); *Dybczak v. Tuskegee Inst.*, 737 F.2d 1524, 1527 (11th Cir. 1984) (injunctive relief benefitting nonparties may be required if it relates to the

28

vindication of the plaintiff's rights);[15] *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) ("'When the court believes the underlying right to be highly significant, it may write injunctive relief as broad as the right itself'" thereby benefiting nonparties) (citation omitted).

Moreover, class certification is unnecessary when, as in this case, public officials are charged with violating plaintiffs' rights under the Constitution or federal law.  For example, in *Soto-Lopez v. New York City Civ. Serv. Comm'n*, 840 F.2d 162 (2d Cir. 1988), plaintiffs successfully challenged the constitutionality of certain residency requirements for civil service exams.  Under the challenged state law, bonus exam points for veterans were denied to Plaintiffs because they were not residents of New York when they entered the armed forces.  The Second Circuit rejected as "meritless" defendant's claim that plaintiffs' "requested relief of general application" was improper, explaining that "[t]he availability of such injunctive relief is not limited to class actions." *Id.* at 168.  Similarly, in *Doe v. Gallinot*, 657 F. 2d 1017 (9th Cir. 1981), a single plaintiff challenged the constitutionality of the state's involuntary commitment statute and procedures.  After finding the statute to be unconstitutional, the court enjoined the state from proceeding with any commitments under the challenged procedure. In rejecting the

---

[15] While the facts in *Meyer, Carmichael* and *Dybczak* did not ultimately warrant injunctive relief, either because the plaintiffs did not seek prospective relief or would not otherwise benefit from it, that is clearly not the situation here. *See infra* at Section IV.

state defendant's argument that the injunction was overbroad regarding nonparties, the court held that there was no abuse of discretion because the "challenged provisions were not unconstitutional as to Doe alone." *Id.* at 1025.

While many of the cases discussed above involve a constitutional or Title VII claim, the same principles apply when single parties seek to enjoin government rules. For example, in *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998), individual plaintiffs successfully challenged the legality of a federal mining rule, and the trial court entered a nationwide injunction. The government appealed the injunction as overbroad in granting relief to nonparties. The D.C. Court of Appeals soundly rejected this argument. "We have made clear that [w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n*, 145 F.3d at 1409 (citation omitted). The court's analysis included a lengthy quote from *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 110 S. Ct. 3177 (1990) demonstrating the Supreme Court's support of the principle that "a single party, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court." *See Nat'l Min. Ass'n*, 145 F.3d at 1409 (citing *Lujan*, 497 U.S. at 913). [16]

---

[16] Although this quote is from Justice Blackmun's dissent, it "apparently expressed the views of the other justices." *Nat'l Min. Ass'n*, 145 F.3d 1409.

Similarly, in *Doe v. Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004), several individual plaintiffs challenged a Department of Defense rule. After noting that a number of circuits have held that injunctions can benefit nonparties and finding that the challenged rule was unlawful, the court held that "the injunction is not prohibited merely because it confers benefits upon individuals not before the court. . . [When government rules are found invalid] government-wide injunctive relief for plaintiffs and all individuals similarly situated can be entirely appropriate." *Id.* at 17-18 (citations omitted).

Also, in Medicaid cases analogous to the one at hand, single parties have challenged state policies excluding coverage of a particular service. After demonstrating that the challenged exclusion violates the Medicaid Act, the state's illegal rule was enjoined and the service was included as a covered benefit. The breadth of the injunction and the incidental relief benefitting nonparties was never an issue. *See, e.g., S.D. ex rel. Dickson v. Hood*, 391 F.3d 581 (5th Cir. 2004) (affirming relief for individual Medicaid EPSDT recipient enjoining state's unlawful policy excluding incontinence supplies and requiring coverage of the supplies); *Smith v. Benson*, 703 F. Supp. 2d 1262 (S.D. Fla. 2010) (same).

As demonstrated by this overwhelming precedent, AHCA's contention that injunctive relief should be limited to the three Plaintiffs in the absence of class certification is clearly wrong. *See* AHCA's Br. at 26. Even the cases AHCA cites

31

support the Plaintiffs. *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) held that a statewide injunction was necessary to ensure the individual plaintiffs received complete relief and cited the familiar holding that: "[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Id.* at 1501-2 (citation omitted). *See also Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); AHCA's Br. at 31.    In sum, the Secretary's new argument represents an unsupportable departure from well-established legal principles and should be rejected on appeal.[17]

---

[17] While arguing that the relief was overly broad in the absence of a certified class, the Secretary also asserts that the district court "could not have certified a class because of the need for individual medical necessity determinations." AHCA's Br. at 27.    As noted above, however, this case did not concern micro-level determinations of whether the prescribed amount of ABA was needed to correct or ameliorate an individual child's condition, but rather focused only on whether AHCA could exclude Medicaid coverage of ABA altogether.  Had the Plaintiffs moved for class certification under Fed. R. Civ. P. 23(b)(2), individual medical necessity determinations would still not have been part of the case.  To be sure, if the Secretary raised her overbroad argument in the court below, Plaintiffs would have certainly made a calculated litigation decision whether to request class certification.

## IV.   THE COURT DID NOT ABUSE ITS DISCRETION AS THE SCOPE OF THIS INJUNCTION IS NO BROADER THAN NECESSARY FOR THE PLAINTIFFS' COMPLETE RELIEF.

There is no disagreement that injunctions represent an "extraordinary remedy" and "should be no more burdensome…than necessary." *See* AHCA's Br. at 27 (citations omitted). The initial authority the Secretary cites simply reiterates these undisputed principles, as well as the principle that injunctions benefiting nonparties are not necessarily overbroad. *See, e.g., Prof'l Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 273-74 (5th Cir. 1984), *cert. denied,* 105 S. Ct. 248 (1984) ("An injunction . . . is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in a lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled.") (citations omitted). *See also Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117 (11th Cir. 2005); *Madsen v. Women's Health Center*, 512 U.S. 753, 114 S. Ct. 2516 (1994) .

The Secretary focuses on three other cases that highlight why the injunction granted in this case was appropriate. *See* AHCA's Br. at 28-30 (discussing *Dybczak v. Tuskegee Inst.*, 737 F.2d 1524 (11th Cir. 1984); *Brown v. Tr. of Boston Univ.*, 891 F.2d 337 (1st Cir. 1989); and *Zepeda v. U.S. Immigration & Naturalization Serv.*, 753 F.2d 719 (9th Cir. 1983)).  While the plaintiffs in these

33

cases did not receive their full requested injunctive relief, easily distinguishable facts support that the requested injunctive relief here is well within the court's discretion.

In *Dybczak*, the plaintiff, a Caucasian professor and administrator at Tuskegee Institute, alleged employment discrimination based on race and sought prospective injunctive relief.   The faculty and students at Tuskegee are predominantly African American.   After the jury returned a verdict establishing that Tuskegee Institute did not discriminate against the plaintiff, the district court denied his request for prospective relief that could have only benefitted other Caucasian faculty "but which is wholly unrelated to the rights of the plaintiff." On appeal, this Court held that "injunctive relief benefiting nonparties is not required if it in no way relates to the vindication of the plaintiffs' rights." *Dybczak,* 737 F.2d at 1527.  Thus, under the reasoning in *Dybczak*, injunctive relief benefitting nonparties is not merely permissible, it is actually "required" if it relates to vindication of plaintiffs' rights.  Here, quite unlike *Dybczak*, the lower court's findings firmly establish that the Plaintiffs were adversely affected by an illegal rule and that issuance of the injunction is needed to vindicate their rights.

In *Brown*, a professor who was denied tenure by Boston University alleged a violation of Title VII.  The jury found that Ms. Brown had been subjected to discrimination based on her gender, and the trial court issued an order which not

only granted her tenure, but also "enjoined the university from discrimination based on sex with respect to appointment, promotion, and tenure of faculty members." *Brown*, 891 F.2d at 345. Finding this portion of the injunction overbroad, the First Circuit underscored the fact that Ms. Brown's case established that "she alone had been the victim of sex discrimination." *Id.* at 361. The facts revealed no official Boston University policy tied to the discriminatory actions. *Id.* By contrast, in this case, the Secretary had an official statewide rule violating federal Medicaid law and injuring the Plaintiffs. Thus, enjoining the illegal rule is essential for the Plaintiffs' complete relief.

Finally, Defendant's reliance upon *Zepeda*, 753 F.2d 719 is misplaced. *See* AHCA's Br. at 28. First, this case involves a permanent injunction while *Zepeda* concerned a preliminary injunction—a feature that has been highlighted by a subsequent Ninth Circuit case, *Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987). In distinguishing *Zepeda*, the *Bresgal* court stressed that *Zepeda* "concerned a preliminary injunction, and limited it to that situation." *Id.* at 1169. *Bresgal* reiterated the rule that "[t]here is no general requirement that an injunction affect only the parties in the suit." *Id.*[18] In rejecting the government's overbreadth

---

[18] The Secretary's standing argument also misconstrues relevant case law as it applies here. AHCA's Br. at 30-31. She cites *Singleton v. Wulff*, 428 U.S. 106, 96 S. Ct. 2868 (1976), for the proposition that Plaintiffs were asserting the rights of third parties rather than their own rights. In *Singleton*, two doctors challenged a state law excluding Medicaid coverage of abortions. The state moved to dismiss on

argument, the *Bresgal* court explained that "an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled."[19] *Id.* at 1170–71.

The issue, then, is whether the Injunction ordered AHCA to do more than what the three Plaintiffs require for their complete relief. Defendant's argument, that an "injunction directing AHCA to cover the ABA services of Plaintiffs would have been sufficient to provide complete relief to the parties" (AHCA's Br. at 29) ignores the record and how the Medicaid program operates. The challenged statewide rule is applicable to all Florida Medicaid-eligible children who suffer from autism disorders and need ABA treatment, including Plaintiffs. Defendant stipulated to the fact that there are no "exceptions" to the rule through which a

---

the grounds that the doctors lacked standing because their claims rested on the rights of third parties—Medicaid recipients—who were not before the Court. But here, the Medicaid beneficiaries asserted *their own legal rights*, not those of third parties.

[19] *Bresgal* did find that, while the injunction was not overbroad in terms of benefitting nonparties, it did intrude unnecessarily on the agency's administrative function in directing implementation of the court's order. The court noted that the manner in which the government implements the court's order to enforce the act is, in the first instance, a matter of agency discretion. *Bresgal*, 843 F.2d at 1171. That part of the holding is not at issue here. While the Defendant was enjoined to take the requisite actions necessary for coverage of ABA, which is essential for Plaintiffs' relief, the specifics of implementation are left to the Secretary, e.g., coverage parameters, prior authorization protocols, and/or utilization review requirements.

36

child can affirmatively obtain Medicaid coverage of ABA. *See* D.E. 98-1 at 7 ¶¶ 35–39; AHCA's Br. at 6, n. 4.  Under the illegal rule, neither the three Plaintiffs — nor any other similarly affected child not before the court—could obtain Medicaid coverage of their prescribed ABA. *See* D.E. 98-1 at 7, ¶¶ 37-40.  Thus, the court could not simply enjoin AHCA's illegal rule only as it applied to the three prevailing Plaintiffs.

Defendant erroneously asserts that "if the district court had proceeded no further than [ordering] the prohibitory injunction[20] and . . . enjoining AHCA's categorical determination that ABA services are experimental and therefore never medically necessary . . . ABA services would have rested on the same footing as all other services that Medicaid covers." AHCA's Br. at 32.  Again, this argument rests on an inaccurate perception of how the Medicaid program and AHCA's rules operate.[21]   In order to "rest on the same footing as other Medicaid covered services"—from medical supplies to physical therapy to prescription drugs, etc.— AHCA must affirmatively include ABA as a covered benefit that can be provided to eligible recipients.   Simply deleting ASD from the Rule's list of diagnoses

---

[20] The Secretary does not argue against the Plaintiffs' first request for injunctive relief, an order requiring AHCA to delete ASD from diagnoses ineligible for coverage of any behavioral health services. *See* AHCA's Br. at 31.

[21] This argument also ignores that Defendant presented evidence regarding the number of children needing ABA, thus prompting the district court to note that other children, in addition to the three Plaintiffs, are being irreparably injured by Defendant's exclusion of ABA in violation of EPSDT. *See* D.E. 123 at 24.

ineligible for any behavioral treatment and correcting the global determination that "ABA is experimental and never medically necessary" does not translate into including ABA as a covered benefit—for the Plaintiffs or anyone else.

In sum, the challenged rule violates the Medicaid Act in two respects: (1) by excluding Medicaid coverage of behavioral health treatment for children with ASD, and (2) by not including ABA as a covered behavioral health service. The three Plaintiffs proved that they met all of the elements required for entry of a permanent injunction. *See* D.E. 123 at 24-25. For complete relief, they needed an order enjoining the Secretary to: (1) eliminate ASD as a diagnosis ineligible for any Medicaid coverage, and (2) include ABA as a covered benefit. As a practical matter, this means enjoining Defendant to do precisely what the trial court ordered: (1) stop excluding coverage of behavioral health treatments for children with autism disorders; (2) provide fund, and authorize prescribed ABA for EPSDT eligible individuals with autism spectrum disorders; (3) designate authorization code(s); and (4) inform relevant providers that ABA is a covered benefit for EPSDT eligible children. *See* D.E. 123 at 25- 26 ¶¶ 1–5. While this Injunction will obviously provide incidental benefit to nonparties, it was "no more burdensome than necessary" for the three Plaintiffs.

## V.   THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ENTERING THE DECLARATORY JUDGMENT.

While injunctions are an extreme remedy which must be narrowly tailored, declaratory judgments are considered a "milder remedy" (*Steffel v. Thompson,* 415 U.S. 452, 94 S. Ct. 1209 (1974)), and it is undisputed that courts have "substantial" discretion in granting this relief. *See, e.g., Wilton v. Seven Falls Co.*, 515 U.S. 277, 286, 115 S. Ct. 2137, 2142 (1995) ("[T]he Declaratory Judgment Act . . . confer[s] unique and substantial discretion on federal courts in deciding whether to declare the rights of litigants.").

The Secretary argues that the lower court's Declaratory Judgment reflects an abuse of discretion because the trial court adopted the Plaintiffs' proposed order and their "purpose" in seeking a Declaratory Judgment was to benefit nonparties. AHCA's Br. at 34-36.  These arguments are not only misleading and irrelevant, they do not remotely approach the "clear error of judgment, or has applied the wrong legal standard" required for reversal of the declaratory judgment. *See Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1325 (11th Cir. 2005).

### A. The Trial Court's Adoption Of The Plaintiffs' Proposed Order Was Not An Abuse Of Discretion.

The Secretary makes much of the fact that the trial court adopted a proposed declaratory judgment order as drafted by the Plaintiffs. AHCA's Br. 33-34. The

cases cited by Defendant– *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th

Cir. 1997), *Colony Square Co. v. Prudential Ins. Co.*, 819 F.2d 272 (11th Cir.

1987), and *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 105 S. Ct. 1504

(1985)– while noting that this practice is "frowned upon," illustrate why the district

court did not abuse its discretion in granting this Declaratory Judgment.

In *Chadusma*, the trial court judge had a "practice of delegating the task of

drafting sensitive, dispositive orders to plaintiffs' counsel, and then uncritically

adopting his proposed orders nearly verbatim." *Chudasama,* 123 F.3d at 1373. This

is not what happened here at all. The judge did not delegate the task of drafting a

declaratory judgment, or any other order to either of the parties' counsel. Rather,

the court asked the parties to submit "status reports." *See* D.E. 134. The Plaintiffs

chose to attach a proposed order to their Report, and the Secretary could have done

so as well.   Further, the district court issued a number of orders, but unlike

*Chudasama*, none were delegated to Plaintiffs' counsel to draft and several were

granted in Defendant's favor. *See, e.g.,* D.E. 74 (order adopting a magistrate report

granting preliminary injunction), D.E. 96 (order granting Defendant's request for

late disclosure of experts), and D.E. 105 (order denying Plaintiffs' Motion for

Summary Judgment).

In *Colony Square* the lower court contacted counsel for Prudential *ex parte*

on several occasions and asked counsel to draft orders.   Nevertheless, this Court

denied Colony Square's appeal, explaining that the trial judge had "played an active and inquiring role" in the proceedings and had already reached a final decision before asking Prudential's lawyers to draft orders. *Colony Square*, 819 F.2d at 276. Similarly, in this case, it is readily apparent from the trial transcript that the Judge played an extremely active and inquiring role (*see, e.g.,* D.E. 147, D.E. 148, D.E. 149, D.E. 150), and, as in *Colony Square*, she had already reached a decision before adopting the proposed declaratory judgment drafted by Plaintiffs' counsel (D.E. 150 at 196-201; D.E. 123).

Finally, in *Anderson*, the Supreme Court considered reversal of an order that was adopted from a party's proposed findings of fact and conclusions of law. After noting their own criticism of this practice, particularly when the findings are not supported by record citations, the Court nonetheless held that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson*, 470 U.S. at 1510–11 (citations omitted). The Court found that the trial court did not uncritically accept the proposed findings and concluded there was no clear error. That is also the case here. First, with the exception of the declarations regarding the Plaintiffs' comparability claim (not addressed in the Injunction Order and reserved by the trial court for possible declaratory judgment D.E. 123 at 25 n. 28), the Proposed Declaratory Judgment Order adopted by the trial court largely mirrors the findings

41

of fact and conclusions of law set forth in the First Amended Preliminary Injunction. *Compare* D.E. 140-1 *with* D.E. 123. Further, the Status Report prepared by Plaintiffs' counsel (to which the proposed order was attached), contained a full and detailed citation to the record, the Injunction Order, and other relevant authority. *See* D.E. 140.

## B. The Trial Court Did Not Abuse Its Discretion In Declaring The Rights And Relations Of The Parties Under The Medicaid Act's EPSDT and Comparability Requirements.

In arguing that the Declaratory Judgment is overbroad, AHCA challenges two specific declarations made by the court: (1) that "ABA is necessary to correct or ameliorate the condition of Autism Spectrum Disorder;" and (2) that "ABA is 'medically necessary [and not experimental].'" *See* AHCA's Br. at 32-3 citing D.E. 144 at 4 ¶¶ 16-17. The Declaratory Judgment is not overbroad for the same reasons that the Injunction is not. As with the Injunction, these declarations address the global determination that ABA is a medically necessary service that must be covered by the state Medicaid program. *See supra* at Sections III and IV.

Pursuant to the Declaratory Judgment Act, federal courts may "declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). That is precisely what the lower court did. Moreover, the parties' Joint Pretrial Stipulations framed the specific "legal rights and relations" addressed in the first

42

challenged declaration. D.E. 144 at 4 ¶ 16.   The parties stipulated that a major issue was "whether the Defendant's exclusion of ABA to treat autism spectrum disorders violates EPSDT." D.E. 98-1 at 12 sec. 8, ¶3. There was no dispute that EPSDT requires "states to cover services for recipients under age 21 that can be covered under 42 U.S.C. § 1396d(a) and that are necessary to *correct or ameliorate the child's condition*." D.E. 98-1 at 12 sec. 7, ¶ 1.[22] Thus, the trial court needed to determine if ABA was necessary to correct or ameliorate autism. After making relevant findings of fact and conclusions of law on this issue, the court was within in its discretion in declaring that the Defendant violated EPSDT by excluding coverage of ABA.  *See* D.E. 144 at 6, ¶ 28.  The Secretary presents no evidence or argument suggesting that these declarations contain or reflect "clear error of judgment, or has applied the wrong legal standard." *See Guideone*, 420 F. 3d at 1325.

Rather than addressing the requisite showing for "abuse of discretion," AHCA challenges the Declaratory Judgment because its purported "purpose" was to spare future nonparties from re-litigating holdings in the Injunction. AHCA's

---

[22] The Pre-Trial Stipulations also set forth the administrative framework demonstrating why the Declaratory Judgment addressing the parties' "rights and relations" included the challenged declarations. *See* D.E. 98-1 at 7 ¶¶ 35-39, ("The Rule lists covered services; the covered services do not include ABA; there is no exception process for obtaining coverage of ABA.").

Br. 34-35.[23] But regardless of the Declaratory Judgment's "purpose" or potential impact *vis a vis* nonparties, the Order legitimately serves to protect the Plaintiffs' rights. *See* 28 U.S.C. § 2202 (establishing a court's discretion to grant "further necessary or proper relief based on a declaratory judgment or decree . . . against any adverse party whose rights have been determined by such judgment"). This is particularly appropriate because, as noted, the Secretary reserves the right to review K.G., I.D. and C.C.'s entitlement to ABA in the future. *See* AHCA's Br. at 12, n. 5.

Finally, the Secretary did not (and could not) argue that the trial court abused its discretion in declaring that AHCA's rule violated comparability. Comparability requires that similarly eligible recipients be treated equitably and that states not discriminate based on the recipients' diagnosis and unrelated to need. *See* D.E. 123 at 11 (citing 42 C.F.R. § 440.230(c)). While it was unnecessary for the trial court to rule on the comparability claim for purposes of affording the Plaintiffs their necessary injunctive relief, it was well within the trial court's discretion to "declare" that AHCA had violated their rights regarding this claim, particularly where comparability had not been addressed in the Injunction.

---

[23] Defendant argues that the principle of non-mutual collateral estoppel does not apply against government defendants. *See* AHCA's Br. at 35-6, citing *U.S. v. Mendoza,* 464 U.S. 154, 104 S. Ct. 568 (1984), and *Hercules Carriers, Inc. v. Fla. Dep't of Transp.*, 768 F2d 1558 (11th Cir. 1985).

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellees respectfully ask the Court to affirm the District Court's Amended Permanent Injunction Order and Order Granting Declaratory Judgment.

Dated: December 29, 2012                    Respectfully submitted,

                                            /s/ Miriam Harmatz
                                            Miriam Harmatz

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of the Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,746 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), according to the word-processing system used to prepare the brief.

/s/ Miriam Harmatz

Miriam Harmatz

## CERTIFICATE OF SERVICE

I certify that on December 29, 2012, a copy of this brief was served by electronic mail to the email addresses listed below.  I also certify that the parties have agreed to accept electronic service.

Stuart Williams
General Counsel
AHCA
2727 Mahan Drive, MS #3
Tallahassee, Florida 32308
Stuart.Williams@ahca.myflorida.com

Cynthia Hain
Assistant General Counsel
AHCA
2727 Mahan Drive, MS #3
Tallahassee, Florida 32308
Cynthia.Hain@ahca.myflorida.com

George N. Meros, Jr.
Gray Robinson, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
George.Meros@gray-robinson.com

Allen Windsor
Gray Robinson, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
Allen.Winsor@gray-robinson.com

Andy Bardos
Gray Robinson, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
Andy.Bardos@gray-robinson.com

/s/ Miriam Harmatz
Miriam Harmatz

**ADDENDUM**

# Florida
# Medicaid

## Community Behavioral Health Services
## Coverage and Limitations Handbook

### Agency for Health Care Administration



# COMMUNITY BEHAVIORAL HEALTH SERVICES
# COVERAGE AND LIMITATIONS HANDBOOK

## Table of Contents

**Chapter/Topic**                                                                    **Page**

*Introduction*
Handbook Use and Format.................................................................ii
Characteristics of the Handbook......................................................iii
Handbook Updates............................................................................iii

*Chapter 1 – Provider Qualifications and Enrollment*
Program Purpose................................................................................1-1
Provider Enrollment Standards.........................................................1-4
Staff Qualifications..............................................................................1-6
Provider Requirements.......................................................................1-9
Prior Authorization and Targeted Utilization Management Process.........1-10

*Chapter 2 - Covered Services, Limitations, and Exclusions*

*Section 1 Community Behavioral Health Covered Services, Limitations And Exclusions*
Service Requirements.........................................................................2-1-1
Service Limits and Restrictions on Provider Reimbursement.................2-1-3
Service Exclusions..............................................................................2-1-4
Assessment Services.........................................................................2-1-6
Treatment Plan Development and Modification...................................2-1-15
Medical and Psychiatric Services.....................................................2-1-19
Behavioral Health Therapy Services.................................................2-1-25
Community Support and Rehabilitative Services................................2-1-29
Clubhouse Services...........................................................................2-1-32
Therapeutic Behavioral On-Site Services for Children and Adolescents........2-1-34

*Section 2 Comprehensive Behavioral Health Assessment*
Description, Purpose, and Recipient Eligibility ..................................2-2-1
Authorization for Services.................................................................2-2-2
Provider Enrollment Requirements....................................................2-2-2
Goals and Components.....................................................................2-2-3
Documentation Requirements and Reimbursement Limitations ...........2-2-8
Staff Qualifications.............................................................................2-2-9

*Section 3 Specialized Therapeutic Foster Care Service*
Description and Service Goals............................................................2-3-1
Provider Enrollment Requirements.....................................................2-3-1
Recipient Eligibility for Specialized Therapeutic Foster Care..............2-3-3
Specialized Therapeutic Foster Care Levels of Service......................2-3-4
Specialized Therapeutic Foster Care Service Requirements...............2-3-5
Level I Specialized Therapeutic Foster Care......................................2-3-7
Level II Specialized Therapeutic Foster Care.....................................2-3-9
Crisis Intervention Services ..............................................................2-3-10

***Chapter 2 - Covered Services, Limitations, and Exclusions,*** continued

***Section 3 Specialized Therapeutic Foster Care Service,*** continued

Specialized Therapeutic Foster Parent Qualifications and Training............................2-3-11
Absences from the Specialized Therapeutic Foster Home .............................2-3-12
Reimbursement Restrictions ..................................................................................2-3-15

***Section 4 Behavioral Health Overlay Services For Youth In Juvenile Justice Settings***

Description and Purpose...........................................................................................2-4-1
Provider Requirements for Behavioral Health Overlay Services ...............................2-4-2
Certification Criteria for Behavioral Health Overlay Services Provider Agencies ......2-4-3
Clinical Staff Qualifications and Responsibilities .....................................................2-4-8
Recipient Eligibility for Behavioral Health Overlay Services ...................................2-4-11
Service Requirements..............................................................................................2-4-12
Medical Record and Documentation Requirements ................................................2-4-13
Recipient Absences from the Behavioral Health Overlay Services Provider ...........2-4-15
Reimbursement Requirements ................................................................................2-4-17

***Section 5 Services For Children Ages 0 Through 5 Years***

Service Requirements..............................................................................................2-5-1
Authorization of Services .........................................................................................2-5-3
Behavioral Health Day Services for Children Ages 24 Months
through 5 Years ......................................................................................................2-5-4
Documentation Requirements .................................................................................2-5-7
Therapeutic Behavioral On-site Services for Children Ages 0
Through 5 Years ......................................................................................................2-5-9

***Section 6 Therapeutic Group Care Service***

Description, Purpose and Goals of Therapeutic Group Care Services ....................2-6-1
Provider Requirements for Therapeutic Group Care Services ..................................2-6-2
Certification Criteria for Therapeutic Group Care Providers....................................2-6-4
Staff Requirements ..................................................................................................2-6-7
Clinical Staff Requirements, Qualifications, and Responsibilities............................2-6-8
Direct Care Staff Requirements, Qualifications, and Responsibilities.....................2-6-13
Staff Orientation and Training Requirements...........................................................2-6-14
Focus and Intensity of Service Requirement............................................................2-6-15
Recipient Eligibility for Therapeutic Group Services ...............................................2-6-17
Clinical Record and Documentation Requirements .................................................2-6-19
Reimbursement Requirements ................................................................................2-6-22

***Section 7 Behavioral Health Overlay Services – Child Welfare***

Description and Purpose...........................................................................................2-7-1
Provider Requirements for Behavioral Health Overlay Services – Child Welfare ......2-7-2
Certification Criteria for Behavioral Health Overlay Services Provider Agencies ......2-7-4
Staff Requirements ..................................................................................................2-7-7
Clinical Staff Qualifications and Responsibilities .....................................................2-7-8

*Chapter 2 - Covered Services, Limitations, and Exclusions,* continued

*Section 7 Behavioral Health Overlay Services For Youth In Child Welfare,* continued
Recipient Eligibility for Behavioral Health Overlay Services ..................................2-7-11
Service Requirements.............................................................................................2-7-12
Medical Record and Documentation Requirements ...............................................2-7-13
Recipient Absences from the Behavioral Health Overlay Services Provider ..........2-7-16
Reimbursement Requirements ...............................................................................2-7-18

**Appendices**
Appendix A – Limited Service Authorization ...........................................................A-1
Appendix B – Authorization for Comprehensive Behavioral
    Health Assessment ...........................................................................................B-1
Appendix C – Comprehensive Behavioral Health Assessment
    Provider Certification..........................................................................................C-1
Appendix D – Specialized Therapeutic Foster Care Provider
    Agency Certification ...........................................................................................D-1
Appendix E – Authorization for Specialized Therapeutic Foster Care....................E-1
Appendix F – Authorization for Crisis Intervention...................................................F-1
Appendix G –Provider Agency Self Certification Form Behavioral
    Health Overlay Services – Department of Juvenile Justice .................................G-1
Appendix H – Provider Agency Certification Form Behavioral Health
    Overlay Services – Department of Juvenile Justice ............................................H-1
Appendix I – Certification of Eligibility for Behavioral Health
    Overlay Services – Department of Juvenile Justice ............................................I-1
Appendix J – Provider Agency Self-Certification Form
    Therapeutic Group Home Services .....................................................................J-1
Appendix K – Therapeutic Group Care Services Provider
    Agency Certification ...........................................................................................K-1
Appendix L – Authorization for Therapeutic Group Care Services...........................L-1
Appendix M – Certification of Eligibility For Behavioral Health
    Overlay Services – Child Welfare........................................................................M-1
Appendix N – Provider Agency Self-Certification Form Behavioral
    Health Overlay Services – Child Welfare.............................................................N-1
Appendix O – Provider Agency Certification Form Behavioral Health
    Overlay Services – Child Welfare........................................................................O-1

**Chapter 3 - Procedure Codes**
Reimbursement Information.....................................................................................3-1
Procedure Code Modifiers .......................................................................................3-3
Appendix P – Procedure Codes and Fee Schedule ................................................P-1

Community Behavioral Health Services Coverage and Limitations Handbook

# INTRODUCTION TO THE HANDBOOK

***Overview***

**Introduction**

This chapter introduces the format used for the Florida Medicaid handbooks and tells the reader how to use the handbooks.

**Background**

There are three types of Florida Medicaid handbooks:

- Provider General Handbook describes the Florida Medicaid Program.
- Coverage and limitations handbooks explain covered services, their limits, who is eligible to receive them, and the fee schedules.
- Reimbursement handbooks describe how to complete and file claims for reimbursement from Medicaid.

Exceptions:  For Prescribed Drugs and Transportation Services, the coverage and limitations handbook and the reimbursement handbook are combined into one.

**Legal Authority**

The following federal and state laws govern Florida Medicaid:

- Title XIX of the Social Security Act,
- Title 42 of the Code of Federal Regulations,
- Chapter 409, Florida Statutes, and
- Chapter 59G, Florida Administrative Code.

**In This Chapter**

This chapter contains:

| TOPIC | PAGE |
|---|---|
| Handbook Use and Format | ii |
| Characteristics of the Handbook | iii |
| Handbook Updates | iii |

Community Behavioral Health Services Coverage and Limitations Handbook

---

### Handbook Use and Format

| | |
|---|---|
| **Purpose** | The purpose of the Medicaid handbooks is to furnish the Medicaid provider with the policies and procedures needed to receive reimbursement for covered services provided to eligible Florida Medicaid recipients.

The handbooks provide descriptions and instructions on how and when to complete forms, letters or other documentation. |
| **Provider** | The term "provider" is used to describe any entity, facility, person or group who is enrolled in the Medicaid program and renders services to Medicaid recipients and bills Medicaid for services. |
| **Recipient** | The term "recipient" is used to describe an individual who is eligible for Medicaid. |
| **General Handbook** | General information for providers regarding the Florida Medicaid Program, recipient eligibility, provider enrollment, fraud and abuse policy, and important resources are included in the Florida Medicaid Provider General Handbook. This general handbook is distributed to all enrolled Medicaid providers and is updated as needed. |
| **Coverage and Limitations Handbook** | Each coverage and limitations handbook is named for the service it describes. A provider who furnishes more than one type of service will have more than one coverage and limitations handbook. |
| **Reimbursement Handbook** | Each reimbursement handbook is named for the claim form that it describes. |
| **Chapter Numbers** | The chapter number appears as the first digit before the page number at the bottom of each page. |
| **Page Numbers** | Pages are numbered consecutively throughout the handbook.  Page numbers follow the chapter number at the bottom of each page. |
| **White Space** | The "white space" found throughout a handbook enhances readability and allows space for writing notes. |

Community Behavioral Health Services Coverage and Limitations Handbook

# CHAPTER 1
# COMMUNITY BEHAVIORAL HEALTH SERVICES
# PROVIDER QUALIFICATIONS AND ENROLLMENT

---

## Overview

**Introduction**

This chapter describes the community behavioral health services program, legal authority for the program, its purpose and characteristics, provider enrollment standards, prior authorization, targeted utilization management, and staff qualifications.

**Background**

Community behavioral health services are governed by Title 42, Code of Federal Regulations (CFR), Part 440.130 and through the authority of Chapter 409.906, Florida Statutes (F.S.). The Florida Administrative Code, Chapter 59G, authorizes implementation of Medicaid policy for community behavioral health services.

**In This Chapter**

This chapter contains:

| TOPIC | PAGE |
|---|---|
| Program Purpose and Definitions | 1-1 |
| Provider Enrollment Standards | 1-4 |
| Staff Qualifications | 1-8 |
| Provider Requirements | 1-9 |
| Prior Authorization and Targeted Utilization Management Process | 1-10 |

---

## Program Purpose and Definitions

**Purpose**

This handbook is intended for use by community behavioral health services providers who are enrolled in the Medicaid program. It must be used in conjunction with the Florida Medicaid Provider Reimbursement Handbook, CMS-1500, which contains specific procedures for submitting claims for payment, and the Florida Medicaid Provider General Handbook, which contains general information about the Florida Medicaid program.

Community Behavioral Health Services Coverage and Limitations Handbook

*Program Purpose and Definitions*, continued

| | |
|---|---|
| **Community Behavioral Health Services** | Community behavioral health services include mental health and substance abuse services provided to individuals with mental health, substance abuse and mental health and substance abuse co-occurring disorders for the maximum reduction of the recipient's disability and restoration to the best possible functional level. Services are limited to those which are medically necessary, are recommended by a treating practitioner and included in an individualized treatment plan.<br><br>Note: See Staff Qualifications in this chapter for a definition of treating practitioner. |
| **Medically Necessary** | Medicaid reimburses for services that are determined medically necessary and do not duplicate another provider's service. In addition, the services must meet the following criteria:<br><br>• Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;<br>• Be individualized, specific, consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the recipient's needs;<br>• Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;<br>• Reflect the level of services that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available statewide; and<br>• Be furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.<br><br>The fact that a provider has prescribed, recommended, or approved medical or allied care, goods, or services does not, in itself, make such care, goods or services medically necessary or a covered service.<br><br>Note: See the Glossary in the Florida Medicaid Provider General Handbook for the definition of medically necessary. |
| **District Alcohol Drug Abuse and Mental Health Program Office** | In the Medicaid community mental health services program, the district alcohol, drug abuse and mental health program office is the local mental health and substance abuse authority within the Substance Abuse and Mental Health office as designated by the District Administrator. |

Community Behavioral Health Services Coverage and Limitations Handbook

---

## *Provider Requirements*, continued

| | |
|---|---|
| **Provider Reimbursement for Medicare Crossover and Third Party Resource Claims** | For dually-eligible Medicare and third party liability (TPL) recipients, Medicaid is the payer of last resort for covered Medicare and TPL behavioral health care services. |
| | In order to bill and be reimbursed for Medicare crossover and TPL claims, a community mental health (CMH) provider is required to have two different "types" of Medicaid provider group numbers: |
| | • One community behavioral health (provider type 05) group provider number in order to be reimbursed by Medicaid for the community behavioral health program procedure codes found in Appendix P of this handbook; and |
| | • One physician (provider type 25) group provider number in order to bill crossover and third party resource claims and be reimbursed for Medicare and TPL behavioral health care CPT procedure codes. |
| | Since there is not a CBH program under Medicare or under most third party resources, the provider has to bill Medicaid under the type of practitioner's (i.e., physician type 25) group provider number, and then the claim will crossover to the applicable Medicaid CPT program code accordingly. |

---

## *Prior Authorization and Targeted Utilization Management Process*

| | |
|---|---|
| **Introduction** | Proviso language adopted by the Florida State Legislature in May 2002 required the Agency for Health Care Administration (AHCA) to adopt a prior authorization process using a targeted utilization management approach focusing on providers which have been determined to exceed specified parameters with regard to service and claims patterns, audit findings or other indicators of potential fraud, abuse or over-billing. |
| **Prior Authorization** | Providers are subject to prior authorization of certain services unless they meet exemption criteria. The prior authorization criteria can be obtained from the First Health Services, Inc. website at http://Florida.fhsc.com. |
| **Utilization Management Plan** | Effective July 1, 2003, all providers are required, on an annual basis, to comply with utilization management criteria in order to be exempt from the prior authorization process. |
| | Utilization management criteria can be obtained from the First Health Services, Inc. website at http://Florida.fhsc.com. |

Community Behavioral Health Services Coverage and Limitations Handbook

# SECTION 1
# COMMUNITY BEHAVIORAL HEALTH SERVICES
# COVERED SERVICES, LIMITATIONS AND EXCLUSIONS

## Service Requirements

| | |
|---|---|
| **Introduction** | The following requirements apply to all Medicaid reimbursable community behavioral health services. |
| **General Requirement** | Providers must request reimbursement only for services:<br><br>• Rendered in the Department of Children and Families district or region in which they have a current Substance Abuse and Mental Health contract.<br>• Provided by individuals employed; under contract; or compensated monetarily by the provider. |
| **Authorization of the Group's Treating Practitioner** | Community behavioral health services are provided under the authorization of the group's treating practitioner.  Provider claims for community behavioral health services must include the provider's group Medicaid number and the treating practitioner's individual Medicaid number regardless of who actually renders the service. |
| **Assessment Requirement** | Prior to the authorization of services, the recipient must receive an assessment of mental status, functional capacity, strengths and service needs.  The purpose of the assessment is to gather information to be used in the formulation of a diagnosis and development of a plan of care including criteria for discharge. |
| **Covered Diagnosis Codes** | Claims for services rendered by community behavioral health services providers will be paid only for the following diagnosis codes: 290 through 298.9, 300 through 301.9, 302.7, 303 through 312.4 and 312.81 through 314.9, 315.3, 315.31, 315.5, 315.8, and 315.9.  Diagnosis codes are found in the International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM).<br><br>Claims must contain only the mental health or substance abuse diagnosis from the list above for which the community behavioral health services are being provided. |

October 2004

Community Behavioral Health Services Coverage and Limitations Handbook

## *Service Requirements,* continued

| | |
|---|---|
| **Recipient Clinical Record** | The clinical record must contain:<br><br>• An evaluation or assessment conducted by a licensed practitioner of the healing arts for diagnostic and treatment planning purposes. For new admissions, the evaluation or assessment by a licensed practitioner of the healing arts for treatment planning purposes must have been completed within the past six months;<br>• Copies of relevant assessments, reports and tests;<br>• Service notes (progress toward treatment plans and goals);<br>• Documentation of service eligibility, if applicable;<br>• Current (within last 6 months) treatment plans, reviews and addenda;<br>• A written description, including clinical findings of the face-to-face interview with the recipient that is signed and dated by a psychiatrist, physician, treating practitioner, master's level certified addictions professional (only for recipients with a substance abuse diagnosis), or licensed practitioner of the healing arts who conducted the interview;<br>• Copies of all certification forms (e.g., comprehensive behavioral health assessment) and<br>• The physician's orders and results of diagnostic and laboratory tests, medication assessment, prescription and management. |
| **Documentation Requirements** | A provider must maintain a medical record for each recipient treated. Written documentation must be maintained to support each service for which Medicaid reimbursement is requested. Documentation must clearly distinguish and reference each separate service billed.<br><br>Service documentation must contain all of the following:<br>• Recipient's name;<br>• Date the service was rendered;<br>• Start and end times for procedures with specified minimum time frames and procedures billed on a per unit basis;<br>• Identification of the setting in which the service was rendered;<br>• Identification of the specific problem, behavior, or skill deficit for which the service is being provided;<br>• Identification of the service rendered, including the specific intervention;<br>• Updates regarding the recipient's progress toward meeting goals and objectives identified in the treatment plan; and<br>• Original, legible signature and credential (e.g., licensed clinical social worker) or functional title (e.g., treating practitioner) of the person rendering the service. |

Community Behavioral Health Services Coverage and Limitations Handbook

### *Service Requirements*, continued

| | |
|---|---|
| **Compliance and Quality of Care Reviews** | A provider's compliance with service eligibility determination procedures, service authorization policy, staffing requirements, and service documentation requirements may be reviewed periodically by staff designated by the Agency for Health Care Administration.  Services provided to recipients in violation of the above may be terminated and funds paid for these services subject to recoupment or fines in accordance with 409.913, F.S.

Quality of care reviews are done periodically in conjunction with the compliance review.  If significant quality deficiencies are identified, a corrective action plan may be required. |

---

### *Service Limits and Restrictions on Provider Reimbursement*

| | |
|---|---|
| **Service Limits** | Service limits are per recipient, per state fiscal year (July 1 through June 30).

An exception is treatment plan development is reimbursed once per provider, per state fiscal year (July 1 through June 30).  Medicaid reimburses a maximum total of two per state fiscal year.

Medicaid will not reimburse for the same procedure code twice in one day. |

Community Behavioral Health Services Coverage and Limitations Handbook

---

### Service Exclusions

| | |
|---|---|
| **Service Exclusions** | Medicaid does not pay for community behavioral health services for treatment of autism, pervasive developmental delay, non-emotional or non-behavioral based developmental disability, or mental retardation.

Services are not considered to be medically reasonable when the recipient has an organic brain disorder (dementia or delirium) or other psychiatric or neurological conditions that have produced a cognitive deficit severe enough to prohibit benefit to the recipient. |
| **Requesting Exceptions to Service Limits** | Requests for exceptions to service limits may be made for recipients under age 21 through Medicaid's prior authorization process. The exceptions to service limit criteria can be obtained can be obtained from the First Health Services, Inc. website at http://Florida.fhsc.com.

<u>Note</u>:  See Chapter 2 in the Florida Medicaid Provider Reimbursement Handbook, CMS-1500, for additional information on requesting prior authorizations. |
| **Service Restrictions for Nursing Facility Residents** | No community behavioral health services are reimbursable for a recipient in a nursing facility unless the recipient has first been assessed by the nursing facility and subsequently referred, in writing, to a community behavioral health services provider.  The referral from the nursing facility must be retained in the recipient's clinical record.  In addition, the recipient's individualized treatment plan must be coordinated and integrated with the nursing facility's plan of care.

The following services are not reimbursable for residents for whom the nursing facility is billing Medicaid on a per diem basis regardless of where the services are rendered.

• Behavioral health screening
• Behavioral health day services
• Psychosocial rehabilitation services
• Behavioral health services
• Clubhouse
• Methadone Maintenance |

---

Community Behavioral Health Services Coverage and Limitations Handbook

*Service Exclusions,* continued

| | |
|---|---|
| **Service Exclusions** | The following are not covered under the community behavioral health services program:<br><br>• Procedure codes not found on the Procedure Code Table in Chapter 3 of this handbook;<br>• Services delivered to a recipient on the day of admission to a statewide inpatient psychiatric program (SIPP). However, community behavioral health services are reimbursable on the day of discharge;<br>• Case management;<br>• Partial hospitalization;<br>• Services rendered to residents of institutions for mental diseases*;<br>• Services rendered to residents of nursing facilities except in circumstances described on the prior page;<br>• Travel time;<br>• Activities performed to maintain and review records for facility utilization, continuous quality improvement, recipient eligibility status processing and staff training purposes;<br>• Activities not performed face-to-face with the recipient except those defined below;<br>• Services rendered by unpaid interns or volunteers;<br>• Services paid for by another funding source; and<br>• Escorting a recipient to and from a service site.<br><br>*Note: See Chapter 1 of this handbook for the definition of institutions for mental diseases. |
| **Face-to-Face Interactions and Exceptions to the Requirements** | Interactions must be face-to-face with the recipient in order to be eligible to receive reimbursement under Medicaid's community behavioral health services program with the following exceptions:<br><br>• Comprehensive medication services when providing review of records.<br>• Therapeutic behavioral on-site services when providing family counseling or developing the behavioral health management plan.<br>• Individual and Family Therapy services when assisting recipients' families and significant others in achieving treatment objectives.<br><br>Note: See Chapter 1 of this handbook for the definition of other responsible persons. |

Community Behavioral Health Services Coverage and Limitations Handbook

# APPENDIX P
# PROCEDURE CODES AND FEE SCHEDULE

These procedure codes are to be used for dates of service October 1, 2004 and after.

## Assessment Services

| Code | Modifier | Description of Service | Maximum Fee |
|------|----------|------------------------|-------------|
| H2000 | HP | HIPAA description: Comprehensive multidisciplinary evaluation, doctoral level<br>(Medicaid Service: Psychiatric Evaluation by physician) | $210.00 per evaluation |
| H2000 | HO | HIPAA description:  Comprehensive multidisciplinary evaluation, masters degree level<br>(Medicaid Service: Psychiatric Evaluation by non-physician) | $150.00 per evaluation |
| H2010 | HO | HIPAA description: Comprehensive Medication Services, per 15 minutes, masters degree level<br>(Medicaid Service: Brief Behavioral Health Status Exam) | $14.66 per quarter hour |
| H2000 | (none) | HIPAA description: Comprehensive multidisciplinary evaluation<br>(Medicaid Service: Psychiatric Review of Records) | $26.00 per review |
| H0031 | HO | HIPAA description: Mental health assessment, by non-physician, masters degree level<br>(Medicaid Service: In-depth assessment, new patient, mental health) | $125.00 per assessment |
| H0031 | TS | HIPAA description: Mental health assessment by non physician, follow-up service<br>(Medicaid Service: In-depth assessment, established patient, mental health) | $100.00 per assessment |
| H0001 | HO | HIPAA description: Alcohol and/or drug assessment, masters degree level<br>(Medicaid Service: In-depth assessment, new patient, substance abuse) | $125.00 per assessment |
| H0001 | TS | HIPAA description: Alcohol and/or drug assessment, follow-up service<br>(Medicaid Service: In-depth assessment, established patient, substance abuse) | $100.00 per assessment |
| H0031 | HN | HIPAA description: Mental health assessment, bachelors degree level<br>(Medicaid Service: Bio-psychosocial Evaluation, mental health) | $48.00 per assessment |

October 2004